UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DENARD BUTLER,                                        :

                        Petitioner,                :

         -against-                                   :

PHILLIP HEATH, Superintendent,                       :
Sing Sing Correctional Facility,

                             :

                        Respondent.
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/18/15

12cv03327 (SAS) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE SHIRA A. SCHEINDLIN, U.S.D.J.:**

    *Pro se* Petitioner Denard Butler ("Petitioner") has filed a petition in this Court for a writ

of habeas corpus under 28 U.S.C. § 2254,[1] following his conviction by a jury, on March 9, 2009,

of two counts of Robbery in the First Degree in violation of N.Y. Penal Law § 160.15(4), two

counts of Robbery in the Second Degree in violation of N.Y. Penal Law § 160.10(1), two counts

of Criminal Possession of a Weapon in the Second Degree in violation of N.Y. Penal Law

§ 265.03(1)(b), and two counts of Criminal Possession of a Weapon in the Third Degree in

violation of N.Y. Penal Law § 265.02(4).  (*See* Form Pet. ¶ 5; Supp. Pet. ¶ 4.)  Petitioner, a

second-time violent offender (*see* Dkt. 14-5, at 60, 63), is currently incarcerated at the Sing Sing

Correctional Facility ("Sing Sing"), in Ossining, New York, where he is serving an aggregate

---

[1] Petitioner's filing consists of a form habeas petition (entitled "Petition Under 28 U.S.C.
§ 2254 for Writ of Habeas Corpus by a Person in State Custody" (Dkt. 1, at 1-10)), which sets
out the procedural background of, *inter alia*, his conviction, sentence, and appeal, but which,
with respect to his habeas claims, references a supplemental, attached document (entitled
"Petition for Habeas Corpus Pursuant to 28 U.S.C. § 2254" (Dkt. 1, at 11-25)), which separately
sets out the basis for those claims, in separately numbered paragraphs.  For ease of reference
herein, this Court will refer to Petitioner's form petition as "Form Pet." and to the attached
supplement as "Supp. Pet." (collectively, "Petition" or "Pet.").  Petitioner has also attached to his
Petition certain exhibits in support of his habeas claims. (*See* Dkts. 1-1 through 1-5.)

sentence of 12 years imprisonment, to be followed by five years of post-release supervision (*see* Form Pet. ¶ 3; Supp. Pet. ¶ 4).

Petitioner challenges his conviction on four grounds:  (1) that the evidence at trial was legally insufficient to support his conviction; (2) that the prosecution violated his constitutional rights by failing to produce impeachment material relating to the testimony of two adverse witnesses; (3) that he was denied his due process rights by the trial court's alleged failure to provide him with a full and fair suppression hearing, and by the absence from trial of a material witness; and (4) that he was deprived of his due process rights by the trial court's denial of his motion to dismiss the case against him on speedy-trial grounds.  (*See* Supp. Pet., at 13-14.) Respondent Phillip D. Heath, Superintendent of Sing Sing ("Respondent"), argues that Petitioner's claims should be dismissed as procedurally barred and, in any event, non-cognizable or meritless.  (*See generally* Respondent's Memorandum of Law in Opposition to the Amended Petition for a Writ of Habeas Corpus, dated October 22, 2012 ("Resp. Mem.") (Dkt. 15).)

For the reasons stated below, I respectfully recommend that the Petition be dismissed in its entirety.

## **BACKGROUND**

### A.    **Factual Background**

Based on the evidence presented by the prosecution at Petitioner's trial,[2] Petitioner was a participant in an armed robbery of two Hispanic men, Ricky Bahamundi Roman ("Bahamundi")[3]

---

[2] With the exception of the jury charge and verdict, which are not included in Respondent's submissions, the transcript of Petitioner's trial has been docketed in this action in segments, found in Dkts. 14-3, 14-4, and 14-5.  The transcript of the first day of trial, February 26, 2009, starts on page 151 of Dkt. 14-3.  The transcript of the second day of trial, March 2, 2009, starts on page 236 of Dkt. 14-3, and continues through page 82 of Dkt. 14-4. The transcript of the third day of trial, March 3, 2009, starts on page 83 of Dkt. 14-1.  The transcript of the fourth day of trial, March 4, 2009 (incorrectly labeled "March 3, 2009" on its cover page) starts on page 233 of Dkt. 14-4, and continues through page 48 of Dkt. 14-5.  For

and Jesus Pichardo ("Pichardo"), at approximately 2:00 a.m. on the morning of October 2, 2006, in the vicinity of East 21st Street and Broadway, in Manhattan.  (*See* Dkt. 14-2, at 159; Dkt. 14-3, at 165; Dkt. 14-4, at 14.)

Bahamundi testified at trial that he and Pichardo, who were walking at the time, were approached and grabbed by two men who had emerged from a stopped SUV (Dkt. 14-3, at 168-169), wearing black sweaters or hoodies that covered their faces (*id.* at 172, 200), and holding guns (*id.* at 170).  The two men pointed the guns at them and robbed them of jewelry (including a bracelet, a ring, and a chain with a cross), a watch, keys, and cash in an amount estimated by Bahamundi to be between $2,000 and $2,500.  (*Id*. at 170-71; *see also id*. at 178.)  The armed men then ran back and got into the SUV.  (*Id*. at 172-73.)

Meanwhile, a traffic enforcement police officer, Matthew Hart, who was in a marked police car (Dkt. 14-4, at 45), saw the stopped SUV, which was double-parked (*id.* at 47-48).   He was unaware of the robbery that had just taken place, but he did see two men get into the SUV, and he saw the vehicle start to move.  (*See id*. at 48-49.)  Officer Hart then saw the SUV inch up on, and squeeze past, cars that were stopped at a traffic light, while honking at the cars that were ahead of it.  (*Id*. at 51.)   Officer Hart gave a little "yelp" of his siren, at which point the SUV ran through the red light, heading westbound on 21st Street.  (*Id*. at 51-52.)  As he started to follow the SUV, Officer Hart heard someone yell, "police, stolen," leading him to believe that the SUV

_____

ease of reference herein, this Court will cite to the trial transcript by identifying the docket number where the citation may be found, and the relevant page numbers of that docket entry – in other words, the page numbers placed on the transcript when it was uploaded via this Court's electronic case filing ("ECF") system.  This Court will follow this same convention in citing to the transcript of Petitioner's suppression hearing (Dkts. 14-1; 14-2; 14-3, at 1-86) and sentencing hearing (Dkt. 14-5, at 57-83).

[3] At times in the record, this victim of the crime is referred to as "Ricky Roman," but this Court will refer to him herein as "Bahamundi," as this was his own stated preference, when giving his name at trial.  (*See* Dkt. 14-3, at 164.)

might have been a stolen vehicle.  (*Id*. at 52.)  He put on his lights and siren and pursued the SUV, which turned left on a red light at the next intersection (Fifth Avenue), and then took off, down Fifth Avenue, at a high speed.  (*Id*. at 52-53.)  Near 12th Street, Officer Hart saw the SUV hit other cars, "ricochet" off those cars, and eventually crash into a light pole at the intersection of 12th Street and Fifth Avenue.  (*Id*. at 55-56.)  At that point, Officer Hart observed four men exit the SUV and start running south.  (*Id*. at 56-57.)  He caught and apprehended one man, later identified as Ricky Bailey ("Bailey").  (*Id.* at 58-59, 108).  In addition, Officer Hart – who had already sent out a radio transmission that he had been in pursuit of a potentially stolen vehicle (*id.* at 53-54) – then sent out a further transmission with a description of the fleeing men, whom he described as wearing dark clothing (*id.* at 58).

A number of other police officers then became involved.  After hearing Officer Hart's radio transmissions, two officers, Wilson Vernelly and his partner, Jason Henaghan, started canvassing the area and spotted two men running eastbound on 10th Street.  (Dkt. 14-3, at 267-69, 312-14.)  Officers Vernelly and Henaghan followed the men in a police car, lost sight of the men briefly, but then saw two taxicabs stopped at a red light on 10th Street and Fourth Avenue.  (*Id*. at 270, 317.)  The driver of the first taxi gestured to the officers with his thumb, pointing to the cab behind him, and that cab then flashed its high beams.  (*Id*. at 272, 317-18.)  Officers Vernelly and Henaghan blocked the second cab's path (*id.* at 273, 317), and found two men inside (later identified as Petitioner and his co-defendant, Deshun Jackson ("Jackson")), "sweating profusely" and breathing heavily (*id*. at 273, 318).  Neither officer, at that time, knew about the robbery, but they did a preliminary frisk of both men for possible weapons.  (*Id*. at 274-75, 319-20.)  Officer Henaghan frisked Jackson and found a bracelet in his pocket (*id*. at 275), and Vernelly frisked Petitioner, and found a ring in his pocket (*id*. at 319-20).

4

Sergeant Hipolito Vargas eventually took custody of both of these pieces of jewelry, as well as another ring that had been recovered from Petitioner's hand (Dkt. 14-4, at 17-19, 38), and a cross on a chain that was apparently recovered from the scene at 10th Street by Sergeant Vargas's partner, Officer Michael Catlin (*id.* at 17).[4]  The bracelet, one of the rings, and the cross were later identified as belonging to the robbery victims.  (*See* Dkt. 14-3, at 171, 180-81.) Sergeant Vargas returned the second ring to Petitioner.  (Dkt. 14-4, at 19, 37.)

Although Jackson was wearing a white shirt when he was apprehended (Dkt. 14-3, at 273), a black hoodie was found by police near the crashed SUV (Dkt. 14-4, at 65).  Police also recovered two guns from the SUV (Dkt. 14-3, at 208-09, 21, 239-40), both of which were found to have been loaded and operable (Dkt. 14-4, at 245-49).  A forensic biologist also analyzed a blood stain found by police inside the SUV (Dkt. 14-3, at 257-58; Dkt. 14-4, at 94-95), and determined that the DNA matched that of Jackson (Dkt. 14-4, at 375-77, 380), who was bleeding at the time that he and Petitioner were found by Officers Vernelly and Henaghen (Dkt. 14-3, at 274-75, 299, 321; Dkt. 14-4, at 40-41).

Police also recovered several cellphones from the SUV and its vicinity.  (*See* Dkt. 14-4, at 65-66, 77-78, 84-85.)   One of the cellphones found within the SUV was determined to belong to Pichardo, one of the victims of the robbery.  (*See* Dkt. 14-3, at 177-78; Dkt. 14-4, at 90-91.) Another cellphone discovered in the SUV apparently contained a contact number for "Nita," who, according to a theory advanced by the prosecution, was a woman named "Juanita," who

---

[4] At Petitioner's suppression hearing, Officer Catlin testified that, after arriving at the location where Petitioner and Jackson were apprehended, and after the taxi in which these suspects had been found had pulled away, he found on the ground, "underneath where the cab would have been," "a big chain with a very large crucifix."  (Dkt. 14-2, at 161-62.)  Officer Catlin, however, did not testify at Petitioner's trial, as he was apparently on vacation in Florida at the time.  (Dkt. 14-4, at 230-32, 236.)

visited Petitioner several times while he was being held in custody, and whom Petitioner called repeatedly while he was detained.[5]

### B.   **Procedural History**

#### 1.   **Suppression Hearing**

On November 26 and 28, 2007, and December 3, 5, and 17, 2007, a pre-trial combined *Mapp*/*Dunaway*/*Huntley*/*Wade* hearing was held before the Honorable Charles H. Solomon, J.S.C., in the Supreme Court of New York, New York County.[6]  (Dkts. 14-1; 14-2; 14-3, at 1-86.)  Petitioner, Jackson, and Bailey moved for the suppression of the physical evidence recovered from the SUV (*see* Dkt. 14-3, at 128), the physical evidence recovered from Petitioner's and Jackson's persons (*see id.* at 131), and certain statements made by the three men after being detained by the police (*see id.* at 121-27).[7]  Finding probable cause for Petitioner's and Jackson's arrests (*id.* at 120) and for the search of the SUV (*id.* at 128-29), the trial court denied their motions to suppress physical evidence recovered from the SUV and from their persons (*id.* at 129, 131).  The court also denied Petitioner's request for suppression of certain of

---

[5] This theory was spelled out by the prosecutor during his summation (*see* Dkt. 14-5, at 40-42), but the trial exhibits to which he referred to support this theory (including, *inter alia,* telephone records and Rikers Island visitors logs) have not been provided to this Court.

[6] This hearing was held pursuant to:  (1) *Mapp v. Ohio*, 367 U.S. 643 (1961), to determine whether physical evidence sought to be used against a Petitioner, Jackson, and Bailey was obtained illegally; (2) *Dunaway v. New York*, 442 U.S. 200 (1979), to determine whether there was probable cause for Petitioner's and Jackson's arrests; (3) *People v. Huntley*, 15 N.Y.2d 72 (1965), to determine whether any statements made by Petitioner, Jackson, and Bailey should be suppressed; and (4) *United States v. Wade*, 388 U.S. 218 (1967), to determine whether Bailey's pretrial identification was the result of impermissibly suggestive procedures.

[7] Bailey also moved for the suppression of certain identification evidence.  (Dkt. 14-3, at 127-28.)

his statements, finding that he had been properly advised of his rights.  (*Id.* at 122-24.)[8]

### 2.  Trial and Sentencing

On February 26, 2009, a jury trial was commenced against Petitioner and co-defendant Jackson before the Honorable Ruth Pickholz, J.S.C.  (Dkt. 14-3, at 151.)  On March 4, 2009,[9] after both the prosecution and defense rested, Petitioner moved for dismissal of the charges against him, arguing that the prosecution had failed to make out a *prima facie* case against him. (Dkt. 14-4, at 254-61.)  The court denied Petitioner's motion.  (*Id.* at 263.)

During the charging conference, the prosecutor requested a "recent and exclusive possession" charge[10] and an "acting in concert" charge, and the court granted both requests.  (*Id.* at 263-65, 276.)  Petitioner also requested missing witness charges with respect to Officer Catlin, Pichardo, the driver of the taxi in which Petitioner and Jackson were found, and another officer who had been present at the scene at 10th Street and Fourth Avenue.  (*Id.* at 267-71.)  The court granted this request with respect to Officer Catlin and Pichardo.  (*Id.* at 279-80.)  Finally, Petitioner requested an adverse inference charge under *Rosario,* due to the prosecution's failure to provide the memo books of Officer Vernelly and Sergeant Vargas.  (*Id.* at 271-72.)  The court denied this request.  (*Id.* at 279.)

On March 9, 2009, the jury returned a verdict against Petitioner, finding him guilty of two counts of first-degree robbery, two counts of second-degree robbery, two counts of second-

---

[8] The prosecution also indicated that it would not seek to offer certain statements made by Petitioner at trial.  (*See* Dkt. 14-3, at 122-23.)  The court ruled that those statements would be admissible only on cross-examination, if Petitioner testified, or on the prosecution's rebuttal case.  (*Id.* at 127.)

[9] Although the transcript for the last day of trial is dated March 3, 2009 (Dkt. 14-4, at 233), it appears that this is a typographical error given the overall chronology of the trial.

[10] Under New York law, "recent and exclusive possession of the fruits of a crime, if unexplained or falsely explained, will justify the inference that the possessor is the criminal." *People v. Galbo*, 218 N.Y. 283, 290 (1916).

degree weapons possession, and two counts of third-degree weapons possession. (*See* Brief for Defendant-Appellant, dated Sept. 27, 2009 ("Pet. App. Br.") (Dkt. 1-1), at 26; Brief for Respondent, dated "April 2010" ("Resp. App. Br.") (Dkt. 1-2), at 3-4.)[11]

On June 16, 2009, Justice Pickholz sentenced Petitioner to concurrent prison terms of 12 years for each of the first-degree robbery convictions, seven years for each of the second-degree robbery and second-degree weapon possession convictions, and five years for each of the third-degree weapon possession convictions, for an aggregate sentence of 12 years imprisonment. (Dkt. 14-5, at 83.) She also sentenced Petitioner to five years of post-release supervision on each count, to run concurrently. (*Id.*)

### 3. Direct Appeal

On June 17, 2009, Petitioner, through counsel, filed a notice of appeal with the Appellate Division, First Department (*see* Pet. App. Br., at 1), and he then perfected the appeal in November 2009 (*see id.* (cover page)). In his direct appeal, Petitioner raised four claims: (1) that the trial court improperly denied Petitioner's motion to dismiss the indictment against him pursuant to Section 30.30 of the New York Criminal Procedure Law (sometimes referred to as the New York "statutory speedy trial" requirement), which sets forth a specific time frame in which the prosecution must establish its readiness for trial[12] (*see* Pet. App. Br., at 28-35); (2) that

---

[11] The record before this Court does not contain the transcript of the March 9, 2009 proceedings. Furthermore, with a few exceptions, the exhibits submitted by Petitioner with his habeas Petition are the same as the exhibits submitted by Respondent with his Answer. Respondent's exhibits, however, were not filed as separate documents on the Docket of this Court; rather, they were filed collectively, as Dkt. 13-1. Accordingly, for ease of reference, this Court will primarily cite to the exhibits submitted by Petitioner, which are separately numbered on the Docket. To the extent this Court cites an exhibit that was filed as a part of Dkt. 13-1, the Court will refer to the page numbers assigned, via the Court's ECF system, to the relevant portion of that docket entry.

[12] Section 30.20 of the New York Criminal Procedure Law is also entitled "speedy trial," and states that "[a]fter a criminal action is commenced, the defendant is entitled to a speedy

Petitioner's federal and state constitutional rights were violated when the police allegedly seized and searched him without probable cause (*see id*. at 35-62); (3) that Petitioner was denied a fair trial by (a) the prosecution's alleged failure to preserve *Rosario* material (specifically, the memo books of Officer Vernelly and Sergeant Vargas), and (b) the trial court's granting of the prosecution's request that the jury be given a "recent and exclusive possession" charge related to Petitioner's alleged possession of stolen jewelry, when certain police witnesses purportedly gave inconsistent testimony on the facts relevant to that charge, and another police witness (Officer Catlin) was unavailable to testify at trial (*see id*. at 63-71); and (4) that the trial court erred by failing to dismiss the case against Petitioner on the grounds that the jury's verdict was not supported by the weight of the evidence or by legally sufficient evidence (*see id*. at 71-74). The People filed an opposition to Petitioner's appeal (*See* Resp. App. Br.), and Petitioner subsequently filed a reply (*See* Ans., Ex. C (Dkt. 13-1, at 227-57)).

By decision dated February 10, 2011, the Appellate Division denied Petitioner's direct appeal, unanimously affirming Petitioner's conviction and sentence. *See People v. Butler*, 917 N.Y.S.2d 147 (1st Dep't. 2011); Pet., Ex. 3 (Dkt 1-3).  The court first addressed Petitioner's challenge to the adequacy of the verdict, finding that "[t]he verdict was based on legally sufficient evidence and was not against the weight of the evidence." *Butler*, 917 N.Y.S.2d at 149 (citation omitted).  In this regard, the court found that there was "no basis for disturbing the jury's credibility determinations," and that, "[a]lthough the robbery victims did not see [Petitioner's] face, there was a chain of circumstantial evidence, including [Petitioner's] possession of jewelry taken in the robbery very shortly after it occurred, that had no reasonable

---

trial."  N.Y. Crim. Proc. L. § 30.20(1).  Unlike Section 30.20, Section 30.30 "addresses only the problem of prosecutorial readiness, and is not a speedy trial statute in the constitutional sense." *People v. Anderson*, 66 N.Y.2d 529, 535 (1985).

explanation except that [Petitioner] was one of the robbers."  *Id.*

The court then went on to discuss Petitioner's unreasonable search and seizure claims, finding that the trial court had "properly denied [Petitioner's] suppression motion," as, based on the information available to the police officers who arrested Petitioner (which the court summarized at some length), the officers "had, at least, reasonable suspicion that [Petitioner and his co-defendant] were the men who had fled from the crashed vehicle, and [the officers] were entitled to frisk them to ensure their own safety."  *Id.* (citations omitted).

The court also found that there was "no merit" to Petitioner's claims regarding the purported unfairness of his trial.  *Id.*

Finally, although finding that the trial court had made an error in calculating the statutory speedy-trial period in Petitioner's case, the Appellate Division held that this error was ultimately inconsequential, as the adjusted time would still have been less than the maximum time allowed under N.Y. Crim. Proc. L. § 30.30.  *Id.* at 149-50.[13]  Accordingly, the court rejected Petitioner's statutory speedy-trial claim.  *Id.* at 150.

By letter dated February 14, 2011, Petitioner, through counsel, sought leave to appeal the Appellate Division's decision to the New York Court of Appeals; that letter enclosed the briefs submitted to the Appellate Division, and stated that, "[u]pon notification of the Judge designated to hear this application, counsel will provide supplemental arguments to the Clerk's Office in support of the applications."  (Letter to Hon. Jonathan Lippman, Chief Judge, Court of Appeals, from Darren S. Fields, Esq., dated Feb. 14, 2011 ("Leave Ltr.") (Dkt. 21).)[14]

---

[13] One Justice issued a concurring opinion, finding that the trial court had made no error in calculating the statutory speedy-trial period.  *Butler*, 917 N.Y.S. 2d at 150-51.

[14] Respondent did not include a copy of this letter in its opposition to the Petition, but later furnished a copy to the Court upon the Court's request, and this Court has undertaken to docket it.

On March 9, 2011, Petitioner, again through counsel, submitted a supplemental letter to the Court of Appeals, as an "addendum" to the letter submitted on February 14th.  (Pet., Ex. 4 (Letter to Hon. Theodore T. Jones from Darren S. Fields, Esq., dated Mar. 9, 2011 ("Addendum to Leave Ltr.") (Dkt. 1-4).)  In this addendum, Petitioner specifically highlighted three of his appellate claims, namely his speedy-trial claim based on New York Criminal Procedure Law § 30.30, his Fourth Amendment claim, and his claim that he was denied a fair trial.  (*See generally id.*)  Petitioner did not, in this letter, mention his claim that the verdict was against the weight of the evidence or was not supported by legally sufficient evidence.

On May 19, 2011, the New York State Court of Appeals, without discussion, denied Petitioner leave to appeal.  *See People v. Butler*, 16 N.Y.3d 893 (2011) (Table); Pet., Ex. 5 (Dkt. 1-5).

### 4.   Habeas Petition

Proceeding *pro* se, Petitioner filed his habeas Petition in this Court on April 18, 2012.[15] As mentioned above, the Petition raises four claims:  (1) that the verdict against Petitioner was not based on legally sufficient evidence; (2) that the prosecutor violated Petitioner's constitutional rights by failing to produce impeachment material; (3) that Petitioner was denied due process by being deprived of a "full and fair" suppression hearing, and by the absence of a witness at trial; and (4) that Petitioner was deprived of his constitutional due process right to a speedy trial.  (Supp. Pet., at 13-14.)

---

[15] Although the docket of this case reflects a filing date of April 26, 2012, a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the Court.  *See Houston v. Lack*, 487 U.S. 266, 270 (1988).  Thus, in the absence of evidence to the contrary, the Court will deem the Petition to have been filed on April 18, 2012, the date Petitioner signed it, declaring, under penalty of perjury, that he had placed it in the prison mailing system.  (*See* Form Pet., at 10; *see also, e.g.*, *Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).)

On October 21, 2012, Respondent opposed the Petition by filing an Answer, with several appended exhibits that largely duplicated the exhibits attached by Petitioner to his Petition (Dkts. 13, 13-1 (*see* n.11 *supra*)), transcripts of Petitioner's pre-trial proceedings, trial, and sentencing (Dkt. 14), and an opposition memorandum of law (Resp. Mem.).  Petitioner submitted a reply memorandum on November 16, 2012.  (Memorandum of Law, dated Nov. 16, 2012 (Dkt. 18).)

**5.**   **Petitioner's Request for Counsel and Application for a Stay**

By application dated August 13, 2012, Petitioner sought the appointment of *pro bono* counsel to represent him in the habeas proceeding.  (Application for Request for the Assignment of Counsel Pursuant to 18 U.S.C. § 3006A, dated Aug. 13, 2012 (Dkt. 11).)  About a month later, Petitioner also applied to the Court for an order staying these proceedings and holding them in abeyance, pending his exhaustion of certain of his habeas claims in the state courts.  (*See* Letter to Hon. Colleen McMahon from Petitioner, dated Sept. 11, 2012 (Dkt. 9), at 1 (stating, "I think that my petition, according to my most recent research, is mixed.").)

By Order dated September 28, 2012, this Court denied Petitioner's request for counsel, although the Court noted that, "[i]f, upon further review of the Petition and the arguments advanced by Respondent, the Court determines that the issues presented are more difficult than they currently appear to be, the Court may revisit its decision at that time."  (Order, dated Sept. 28, 2012 (Dkt. 12), at 7.)  At the same time, this Court denied Petitioner's application for a stay and abeyance, without prejudice to Petitioner's refiling of a proper motion describing, with specificity, which claims remained unexhausted, and why, under *Rhines v. Weber*, 544 U.S. 269 (2005), a stay would be appropriate.  (*See id.* at 1-2.)

On October 16, 2012, Petitioner appealed this Court's September 28 Order to the Honorable Colleen McMahon, to whom this case was then assigned.  (Appeal from Memorandum and Order, dated Oct. 16, 2012 ("App. of Stay Dec.") (Dkt. 17).)  In that submission, Petitioner explained his view that the first claim he had presented in this habeas proceeding – his legal insufficiency claim – had been fully exhausted, but that his other three claims remained unexhausted.  (*Id*. at 4.)  Petitioner further attempted to explain why those claims had not been exhausted:  As to his second claim (accusing the prosecution of failing to produce impeachment material), Petitioner suggested that the claim had only been presented in state-law (*i.e.*, *Rosario*) terms, rather than in federal (*i.e.*, *Brady*[16]) terms, because his trial counsel – who had also served as his appellate counsel – had either been "unable to present this claim from the perspective of one reviewing the record in search of meritorious constitutional errors, and was unable to brief such issues in [the appellate] context, or was unaware of the magnitude of the error with respect to federal law as determined by the U.S. Supreme Court." (*Id*. at 5-6.)  Petitioner similarly blamed his appellate counsel for having failed to raise his third and fourth claims (regarding the constitutional adequacy of Petitioner's suppression hearing, and his alleged constitutional deprivation of a speedy trial) in federal terms, on direct appeal.  (*Id*. at 6-7.)  By Order dated October 31, 2012, the Court (McMahon, J.) denied Petitioner's appeal in all respects. (*Id*. at 1 (Mem. Endors.).)

---

[16] *Brady v. Maryland*, 373 U.S. 83, 87 (1963), provides that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

**DISCUSSION**

I. **APPLICABLE LEGAL STANDARDS**

    A.     **Statute of Limitations**

        Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petition must be filed within one year of the latest of four dates specified by statute, usually "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A) (2000); *see also Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001) (judgment becomes "final" for purposes of Section 2244 upon "the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner elects not to file a petition for certiorari – [the expiration of] the time to seek direct review via certiorari").[17]

    B.     **Exhaustion**

        A federal court generally may not consider a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies. 28 U.S.C. § 2254(b)(1)(A); *see Picard v. Connor*, 404 U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his federal claims to the state courts, thereby affording those courts the "initial opportunity to pass upon and correct

---

        [17] The limitations period may alternatively begin to run on the following dates: (1) where the petitioner was prevented from filing an application by state action, the date on which the impediment is removed; (2) where the right asserted is a newly recognized one made retroactively applicable, the date on which the constitutional right asserted was initially recognized by the Supreme Court; and (3) the date on which the factual predicate of the claim presented could have been discovered through the exercise of due diligence. 28 U.S.C. § 2244(d)(1)(B)-(D).

alleged violations of [the] prisoners' federal rights." *Picard*, 404 U.S. at 275 (internal quotation marks and citation omitted).

The state courts must be apprised of the factual and legal premises of the claim the petitioner asserts in federal court. *Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997). There are several ways by which a petitioner can fairly present a federal claim to the state appellate court, including by demonstrating either

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) an assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, [or] (d) [an] allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Ramirez v. Attorney Gen.*, 280 F.3d 87, 95 (2d Cir. 2001) (citing *Daye v. Attorney Gen.*, 696 F.2d 186, 194 (2d Cir. 1982); *see Davis v. Strack*, 270 F.3d 111, 122-23 (2d Cir. 2001).

Aside from setting out the federal nature of his claims, the petitioner must also, for purposes of the exhaustion requirement, present those claims to "the highest court of the pertinent state." *Larocco v. Senkowski*, 65 F. App'x 740, 742 (2d Cir. 2003) (summary order) (internal quotation marks and citations omitted); *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995). To accomplish this in New York, on direct appeal, a petitioner must first appeal his conviction to the Appellate Division and then seek "further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005). A court will find the exhaustion requirement to be satisfied with respect to a particular claim where the "fair import" of the "total application" to the Court of Appeals suggests a request for review of that claim. *Id.* at 75-76.

Where a claim has not been exhausted in the state courts, but the petitioner no longer has any available avenue to return to the state courts to exhaust the claim, the habeas court should

"deem" the claim exhausted.  *See Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991); *cf.* 28 U.S.C. § 2254(b)(3) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented.").

### C.    Federal Habeas Review of Procedurally Defaulted Claims

When a claim is "deemed" exhausted, it will nonetheless be barred from habeas review in federal court, unless the petitioner can show "cause" for his procedural default, and that "prejudice" resulted therefrom.  *Gray v. Netherland,* 518 U.S. 152, 162 (1996) ("[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." (citations omitted)); *see also Martinez v. Ryan*, 132 S.Ct. 1309, 1316 (2012); *Ramirez*, 280 F.3d 87, 94 (2d Cir. 2001) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).[18]

"Cause" for a procedural default is established when "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Ayuso v. Artuz*, No. 99cv12015 (AGS) (JCF), 2001 WL 246437, at *8 (S.D.N.Y. Mar. 7, 2001).  One way in which a petitioner can establish "cause" is to show that the procedural default was the result of ineffective assistance of counsel; such ineffective assistance, however, must have itself been sufficiently egregious to

---

[18] A defaulted claim may also be reviewed on federal habeas where a "fundamental miscarriage of justice" would result from the court's failure to review the claim, but to satisfy this exception to the procedural bar, the petitioner must make a showing of actual innocence. *See Schlup v. Delo*, 513 U.S. 298, 326–27 (1995); *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002).  "Actual innocence" means "factual innocence, not mere legal insufficiency."  *Dunham*, 313 F.3d at 730 (citations omitted).  "To be credible," a claim of actual innocence would require the petitioner to come forward "with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence."  *Schlup*, 513 U.S. at 324.

amount to a constitutional violation. *Murray*, 477 U.S. at 488-89; *see Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) ("Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution. In other words, ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim." (citing *Murray*, 477 U.S. at 488-89); *Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001) ("A defense counsel's ineffectiveness in failing to properly preserve a claim for review in state court can suffice to establish cause for a procedural default only when the counsel's ineptitude rises to the level of a violation of a defendant's Sixth Amendment right to counsel.").

Furthermore, such an ineffective assistance claim must have been independently presented to the state courts before it can be considered as cause for default on federal habeas review. *Murray*, 477 U.S. at 489. The *Murray* Court elaborated as follows:

> [I]f a petitioner could raise his ineffective assistance claim for the first time on federal habeas in order to show cause for a procedural default, the federal habeas court would find itself in the anomalous position of adjudicating an unexhausted constitutional claim for which state court review might still be available. The principle of comity that underlies the exhaustion doctrine would be ill served by a rule that allowed a federal district court "to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," and that holds true whether an ineffective assistance claim is asserted as cause for a procedural default or denominated as an independent ground for habeas relief.

*Id.* (internal citations omitted).

As for the "prejudice" prong, while the Supreme Court has not given "precise content" to the term "prejudice," *see Wainwright*, 433 U.S. at 91, it has made clear that a petitioner must show more than "a possibility of prejudice," and must show that the legal errors raised in the petition "worked to [the petitioner's] *actual* and substantial disadvantage," *U.S. v. Frady*, 456

17

U.S. 152, 170 (1982) (emphasis in original).  This is "a significantly higher hurdle than would exist on direct appeal," *id.* at 166, as the degree of prejudice must be sufficient "to overcome society's justified interests in the finality of criminal judgments." *id.* at 175.  Certainly, where a petitioner's claim lacks merit, he cannot demonstrate that his procedural default of the claim has resulted in prejudice sufficient to overcome the procedural bar.  *See McDowell v. Heath*, No. 09cv7887 (RO) (MHD), 2013 WL 2896992, at *25 (S.D.N.Y. June 13, 2013) ("Petitioner also cannot establish actual prejudice because his ineffective-assistance claim has no merit."); *Grullon v. United States*, No. 04cv7144 (SAS), 2006 WL 559668, at *7 (S.D.N.Y. Mar. 8, 2006) ("[Petitioner] has not shown any prejudice because he has failed to demonstrate that his [claim] would succeed on the merits."); *Stanley v. Smith*, No. 12cv6362 (AT) (SN), 2014 WL 5039444, at *16 (S.D.N.Y. Sept. 26, 2014) ("[I]f the underlying claim could not prevail, denying an opportunity to raise that claim is not fundamentally unfair." (citations omitted)).

## II.   PETITIONER'S HABEAS PETITION

### A.   Timeliness of Petition

As a threshold matter, this Court finds that Petitioner filed his federal habeas Petition within the one-year statute of limitations provided by the AEDPA.

On May 19, 2011, the New York Court of Appeals denied Petitioner's request for leave to appeal from the Appellate Division's affirmance of his conviction.  *See People v. Butler*, 16 N.Y.3d 893 (2011) (Table); Pet. Ex. 5 (Dkt. 1-5).  Ninety days later, on August 17, 2011, Petitioner's conviction became final for purposes of the AEDPA limitations period.  *See Williams*, 237 F.3d at 150.  Petitioner thus had one year from that date, or until August 17, 2012, to file his federal habeas Petition.  *See* 28 U.S.C. § 2244(d)(1)(A).  As noted above (*see* n.15,

*supra*), the Petition was filed on April 18, 2012.  Given that this filing was well-within the one-year limitations period, the Petition was timely filed.

### B.    Petitioner's Claims

Notwithstanding the fact that it was timely filed, however, the Petition is subject to dismissal by the Court because each of Petitioner's claims are unexhausted and procedurally barred from review by this Court.

### 1.    Petitioner Has Not Fully Exhausted Any of His Habeas Claims.

Petitioner asserts that his Petition is "mixed" (Letter to Hon. Colleen McMahon from Petitioner, dated Sept. 11, 2012 (Dkt. 9), at 1), *i.e.*, that it contains both exhausted and unexhausted claims, *see Rhines v. Weber*, 544 U.S. 269, 271 (2005).  In particular, Petitioner contends that he exhausted his first habeas claim, challenging the legal sufficiency of the evidence presented at trial, although he concedes that he has not exhausted the remainder of his federal claims.  (App. of Stay Dec., at 4.)  Respondent, for his part, contends that none of Petitioner's claims has been exhausted, including his legal insufficiency claim.  (Answer ¶ 4; Resp. Mem., at 32-35.)  This Court agrees with Respondent.

As to Petitioner's legal insufficiency claim, this Court does accept that, although Petitioner primarily relied on state law in his brief to the Appellate Division, he adequately raised the constitutional principle that the verdict needed to be supported by evidence capable of establishing each element of the crime beyond a reasonable doubt, and argued that the evidence in his case failed to meet that standard.  (*See* Pet. App. Br., at 73-74.)[19]  Moreover, the Appellate

---

[19] In his brief before the Appellate Division, Petitioner also argued that the verdict against him was not supported by the "weight of the evidence."  (*See* Pet. App. Br., at 71-73.)  A "weight of the evidence" claim, however, is grounded in state law, and thus is not cognizable on habeas review.  *See Estelle v. McGuire,* 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." (citations omitted)); *see also People v. Bleakley*, 69 N.Y.2d 490,

Division apparently accepted that Petitioner had raised a legal insufficiency claim, as it explicitly addressed such a claim in its decision.  *Butler*, 917 N.Y.S.2d at 149.

Respondent, however, argues that Petitioner then abandoned this claim, by failing to raise it in his request for leave to appeal to the New York Court of Appeals.  (*See* Resp. Mem., at 32-33.)  On this point, the Court notes that the initial letter filed by Petitioner in the Court of Appeals did not identify any particular claim that Petitioner sought to press on further appeal, but merely enclosed copies of the briefs that had been submitted to the Appellate Division.  (*See* Leave Ltr.)  If this had been the extent of Petitioner's submission, it would have been sufficient to exhaust all of the claims that he had raised below.  *See Galdamez*, 394 F.3d at 76 (concluding that the Court of Appeals would construe such an application as a request for review of all of the claims raised in the briefs).

Petitioner, though, went on to supplement his leave application with a lengthy follow-up letter, laying out detailed arguments in support of certain of his claims, but making no mention of any claim relating to the sufficiency of the evidence.  (*See generally* Addendum to Leave Ltr.)  Under these circumstances, Respondent is correct that Petitioner cannot be found to have fully exhausted his legal insufficiency claim.  *See Galdamez*, 394 F.3d at 76 (holding that a petitioner's "total application" to the Court of Appeals must be considered to determine whether the "fair import" of that application suggests a request for review of all of the claims presented to the Appellate Division); *see also id*. (noting that, where a petitioner has "affirmatively directed the Court of Appeal[s'] attention *away* from claims contained in the attached briefs," those claims will not be considered exhausted (emphasis in original)).  This is particularly true where,

_____

492-95 (1987) (explaining state-law basis for a "weight of the evidence" claim); *Douglas v. Portuondo*, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002) ("A federal habeas court cannot address 'weight of the evidence' claims because . . . the 'weight of the evidence' argument is a pure state law claim . . . for which habeas review is not available." (internal citations and quotation marks omitted)).

as here, the initial letter submitted by Petitioner's counsel did not specifically indicate that Petitioner sought review of *all* issues raised before the Appellate Division.  *See Morgan v. Bennett*, 204 F.3d 360, 370-71 (2d Cir. 2000) (holding all issues raised before Appellate Division had been exhausted where petitioner sent initial letter to Court of Appeals requesting review of "all issues" contained in appellate briefs, and later sent a supplemental letter highlighting specific claims); *Ramirez*, 280 F.3d at 97 (holding *Morgan* did not control where the initial letter did not contain a request for the Court of Appeals to review "all issues" in the briefs).

As for Petitioner's remaining claims, Respondent accurately points out that Petitioner never raised any of these claims in federal terms in the state courts (*see* Resp. Mem., at 33-34), and Petitioner has acknowledged this (App. of Stay Dec., at 4-7).[20]  Accordingly, the Court should find that none of Petitioner's habeas claims have been exhausted.

### 2.    Each of Petitioner's Claims Should Be "Deemed" Exhausted, and Found To Be Procedurally Barred from Federal Habeas Review.

As discussed above, where a claim has not been exhausted in the state courts, but the petitioner no longer has any available avenue to return to the state courts to exhaust the claim, this Court should "deem" the claim exhausted.  *See Castille*, 489 U.S. at 351 (1989); *Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991).

---

[20] As discussed further below, Petitioner, on his direct appeal, raised a claim relating to the failure of the State to produce police memo books (the same facts that underlie his second habeas claim), but he did so only in terms of an alleged state-law *Rosario* violation, not in federal constitutional terms.  (*See* Discussion *infra*, at II(B)(3)(b).)  Also on direct appeal, Petitioner raised a Fourth Amendment challenge to the trial court's failure to suppress evidence, but he did not (as he does now, in his third habeas claim), raise a due process challenge to the fairness of the suppression hearing itself.  (*See* Discussion *infra*, at II(B)(3)(c).)  Finally, while Petitioner raised a state statutory "speedy trial" claim on direct appeal, he did not raise a federal constitutional claim relating to any delay in his trial (as he does now, for his fourth habeas claim).  (*See* Discussion *infra*, at II(B)(3)(d).)  Petitioner has conceded all of this, in his submissions to this Court.  (App. of Stay Dec., at 4-7.)

Here, by abandoning his legal insufficiency claim in his application for leave to appeal to the New York Court of Appeals, Petitioner forfeited his one opportunity to place that claim before that court. *See, e.g.*, *Ricco v. Burge*, No. 06cv4902 (RJH) (THK), 2009 WL 4341521, at *15 (S.D.N.Y. Dec. 2, 2009) (claim raised on direct appeal but not in request for leave to appeal to Court of Appeals was unexhausted and procedurally barred because "a person is only entitled to one request for leave to appeal" (citations omitted)).

As for his other habeas claims, as none are based on information outside the record, all were capable of being raised by Petitioner on his direct appeal, and have similarly been forfeited. Petitioner is not entitled to a second direct appeal. *See Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006) (finding that remedies were no longer available in New York State courts for a record-based claim, where "[petitioner] ha[d] already taken his one direct appeal"), *cert denied sub nom. Jimenez v. Graham*, 549 U.S. 1133 (2007). Petitioner is also foreclosed from raising record-based claims on a collateral motion to vacate his conviction. *See* N.Y. Crim. Proc. L. § 440.10(2)(c) (barring collateral review of claims that could have been raised on direct appeal). Nor can he seek state review of such claims pursuant to either a writ of error *coram nobis, see People v. Gordon*, 584 N.Y.S.2d 318 (2d Dep't 1992) (*coram nobis* relief only available for claims of ineffective assistance of appellate counsel (citation omitted)), or a state writ of habeas corpus, *see People ex rel. Allah v. Leonardo*, 565 N.Y.S.2d 331, 331 (3d Dep't 1991) (state writ of habeas corpus unavailable where claim could have been raised on direct appeal (citations omitted)). As Petitioner thus has no procedural recourse to New York's courts to advance any of his unexhausted claims, the claims should all be deemed exhausted.

In order for this Court to review his claims, then, Petitioner must demonstrate both "cause" for his forfeiting of the claims in state court, and that "prejudice" resulted from the

default.[21]  With respect to his legal insufficiency claim, Petitioner has not asserted any "cause" for his abandonment of the claim on direct appeal, and none is evident from the record.  As a result, this Court need not even reach the question of whether he can show the requisite "prejudice."  *See Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985) ("Since a petitioner who has procedurally defaulted in state court must show both cause and prejudice in order to obtain federal habeas review, we need not, in light of our conclusion that there was no showing of cause, reach the question of whether or not [petitioner] showed prejudice").  Nonetheless, this Court will address the "prejudice" prong below.

As to his remaining three claims, Petitioner has asserted, in his appeal from this Court's denial of his application for a stay of these proceedings, that his appellate counsel was to blame for the failure to raise the claims at all, on Petitioner's direct appeal.  (*See* App. of Stay Dec., at 5-6 (Petitioner stating that the reason he failed to exhaust his second claim was that his appellate counsel, who had also served as his trial counsel, was either "unable" to present a federal constitutional claim on appeal, or was "unaware of the magnitude of the error with respect to federal law . . ."); *see also id*. at 7 (stating that his failure to exhaust his second, third and fourth claims "was the result of the ineffective assistance provided to Petitioner by counsel").)  Petitioner, however, did not separately exhaust any claim of ineffective assistance of counsel prior to raising his habeas claims in this Court, and thus he cannot, at this time, raise his counsel's alleged deficiencies as a basis to excuse his procedural defaults.

Although Petitioner has suggested that he may still wish to exhaust an ineffective-assistance-of-appellate-counsel claim via an application, in the state court, for a writ of error *coram nobis* (*see* Supp. Pet., at 10 n.7 (stating that "Petitioner reserves the right to file a writ of

---

[21] As discussed *supra* at n.18, a federal court may alternatively review a procedurally barred claim where the petitioner makes a showing of actual innocence.  Petitioner has not attempted to make such a showing here.

error *coram nobis* in the state court – for unexhausted issues")), staying these proceedings so that Petitioner might make such an application would be inappropriate under *Rhines*,[22] and would serve little purpose.  At bottom, regardless of whether Petitioner can, on *any* grounds, establish "cause" for his procedural default, he cannot, in any event, demonstrate – as to any of his habeas claims –  the "prejudice" that would also be necessary to enable him to overcome the procedural bar to this Court's review of his claims.

> **3.      Petitioner Cannot Demonstrate the "Prejudice" Needed To Overcome His Procedural Default, as He Cannot <u>Show That Any of His Habeas Claims Are Meritorious.</u>**

As set out above, in order to overcome the procedural bar to this Court's review of his defaulted claims, Petitioner would not only have to demonstrate "cause" for his procedural default, but also "prejudice" – *i.e.*, that the procedural default worked to his "actual" and "substantial" disadvantage.  *Frady*, 456 U.S. at 170.  In other words, he would have to demonstrate convincingly that his claims are not only meritorious, but that their forfeit actually and substantially disadvantaged him.  As Petitioner cannot make this showing here as to any of his claims, even if those claims were considered *de novo*,[23] this Court recommends that all of Petitioner's claims be dismissed as procedurally barred.

---

[22] As Petitioner has not alleged good cause for his failure to pursue his ineffective-assistance-of-appellate-counsel claim before filing his habeas petition, he would not be entitled, under *Rhines,* to a stay of these proceedings, so that he could exhaust such a claim now.  *See* 244 U.S. at 277.

[23] Where a petitioner's claims have been raised and fully exhausted in the state courts, and adjudicated there on the merits, any federal review of the merits of the claims must be under the deferential standard of review set forth in AEDPA.  *See* 28 U.S.C. § 2254(d); *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001).  Where, however, claims have not been adjudicated by the state courts on the merits, they can only be reviewed *de novo.  See Aparico v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001).  This Court recognizes that Petitioner's legal insufficiency claim was, in fact, decided on the merits by the Appellate Division, although, in this Court's view, Petitioner then abandoned that claim in seeking further appeal.  As, for the reasons discussed herein, the claim would fail even on *de novo* review, it would necessarily fail if reviewed under the AEDPA

a.    **Legal Insufficiency of the Evidence**

The Due Process Clause of the 14th Amendment prohibits conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In challenging the constitutional sufficiency of the evidence underlying a conviction, a petitioner "bears a heavy burden . . . because the government receives the benefit of having all permissible inferences drawn in its favor." *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002) (internal quotation marks and citations omitted). In evaluating a legal insufficiency claim, a court thus does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal quotation marks and citation omitted; emphasis in original). Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319 (citation omitted; emphasis in original).

In making this determination, "pieces of evidence must be viewed in conjunction, not in isolation." *United States v. Podlog*, 35 F.3d 699, 705 (2d Cir. 1994) (citation omitted), *cert. denied sub nom. Romano v. United States*, 513 U.S. 1135 (1995). It is also not enough for a petitioner to show that the evidence had inconsistencies. *See, e.g.*, *United States v. Lewis*, 423 F. App'x 79, 80 (2d Cir. 2011). "[A] reviewing court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must

---

standard. *See Messiah v. Duncan*, 435 F.3d 186, 197 (2d Cir. 2006) ("We need not determine here whether [the petitioner's] claims were adjudicated on the merits by the state courts, thereby triggering AEDPA review, because his claims would fail even if we apply the [*de novo*] standard.").

defer to that resolution." *McDaniel v. Brown*, 588 U.S. 120, 133 (2010) (internal quotation marks and citation omitted).  In fact, "the testimony of a single uncorroborated eyewitness is generally sufficient to support a conviction." *Ledesma v. Cunningham*, No. 03cv6322 (LAK) (GWG), 2004 WL 1775677, at *12 (S.D.N.Y. Aug. 10, 2004) (citations omitted), *report and recommendation adopted*, 2004 WL 2319326 (Oct. 14, 2004).

"For sufficiency of the evidence claims relating to state court convictions, a federal habeas court 'must look to state law to determine the elements of the crime [of which the petitioner was convicted].'"  *Haith v. Walsh*, No. 08cv6753 (NRB), 2009 WL 2433747, at *4 (S.D.N.Y. July 30, 2009) (alteration in original; quoting *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999)).  Here, Petitioner was convicted of two counts of each of the following New York state crimes:  first-degree robbery, second-degree robbery, second-degree weapon possession, and third-degree weapon possession – specifically, for having violated certain, identified sub-sections of each of the relevant statutory provisions.

As to first-degree robbery, Petitioner was convicted under New York Penal Law § 160.15(4), which is violated when a person "forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . [d]isplays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm."[24]  As to second-degree robbery, Petitioner was convicted under New York Penal Law § 160.10(1), which is violated when a person "forcibly steals property and when . . . [h]e is aided by another person actually present."  An individual is also criminally liable for this offense when he or she "solicits, requests, commands, importunes, or intentionally aids" another individual to

---

[24] The statute also provides that it is an affirmative defense to this crime that the firearm "was not a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged."  N.Y. Penal L. § 160.15(4).

engage in such conduct.  *See* N.Y. Penal L. § 20.00.  Petitioner's second-degree weapon possession convictions were based on New York Penal Law § 265.03(1)(b), which is violated when a person "possesses a loaded firearm," with "intent to use [it] unlawfully against another," and his third-degree weapon possession convictions were based on New York Penal Law § 265.02(4), a section that was later repealed,[25] but which, at the time of the underlying events, simply made it unlawful to possess a loaded firearm.

Based on the arguments made by Petitioner before the Appellate Division, it appears that he is claiming that there was insufficient evidence to link him to the robberies of which he was convicted (or, presumably, to the guns found in the SUV), as (a) the record showed that Petitioner's clothing did not match the descriptions provided by either the victims of the crime or by Officer Hart, who was the first police officer to see the occupants of the SUV leave the scene of its crash, (b) neither Officer Hart nor Bahamundi was able to identify Petitioner has having fled the SUV or participated in the robbery, (c) the only police witnesses to identify Petitioner as having been in possession of stolen property were Officer Vernelly and Sergeant Vargas, both of whom claimed to have lost their memo books, such that they should not have been considered credible, and (d) even if these witnesses were credible, at most their testimony would prove that Petitioner possessed stolen property, not that he participated in the robberies (or possessed a firearm).  (*See* Pet. Ex. 1, at 71-74.)  Viewing the evidence in the light most favorable to the prosecution, however, a rational jury could have concluded beyond a reasonable doubt that Petitioner committed each of these crimes by possessing two firearms, and by participating, with others, in the forcible stealing of jewelry from two victims, during the course of which theft, at least one of the participants displayed a firearm.

---

[25] The crimes of which Petitioner was convicted took place on October 2, 2006, which was just before the repeal of New York Penal Law § 265.02(4) became effective.  *See* 2006 Sess. Law News of N.Y. Ch. 742 (S. 8467) (effective Nov. 1, 2006).

Notwithstanding Petitioner's arguments to the contrary, the prosecution presented ample evidence linking him to the robberies and to the SUV.  Bahamundi testified that he and Pichardo were robbed at gunpoint by two men who had emerged from, and returned to, a stopped SUV. After being pursued by the police, the SUV crashed, and four individuals exited it and fled. Shortly thereafter, Petitioner was arrested a few blocks from the site of the crash – sweating and out-of-breath – with Jackson.  The prosecution presented evidence that Bahamundi's stolen jewelry was recovered on Petitioner's and Jackson's persons, as well as at the scene where Petitioner and Jackson were arrested.  Furthermore, Jackson's blood was found in the SUV, and the prosecution apparently presented evidence suggesting that Petitioner's cell phone had been found in the SUV.  Finally, two loaded and operational firearms were recovered from the SUV, and, under New York law, the presence of a firearm in an automobile constitutes presumptive evidence of its possession by all persons occupying the automobile.  N.Y. Penal L. § 265.15(3).

In evaluating the sufficiency of this evidence, this Court is required to give the prosecution the benefit of "all permissible inferences."  *Dixon*, 293 F.3d at 81.  Thus, although Petitioner takes particular issue with the reliability of the testimony of Officer Vernelly and Sergeant Vargas that a stolen ring was in fact recovered on Petitioner's person, the Court must assume that the jury considered any inconsistencies in their testimony as well as the absence of the memo books (and of Officer Catlin), and determined that their testimony was nonetheless credible.  *See McDaniel*, 588 U.S. at 133.  Giving the prosecution the benefit of all permissible inferences, then, it is clear that Petitioner cannot satisfy the standard set out in *Jackson*, as he cannot demonstrate that, in view of the trial evidence, taken as a whole, no reasonable trier of fact could have found that the prosecution had proven each element of the crimes in question, beyond a reasonable doubt.  In other words, this Court agrees with the Appellate Division's

determination that the "chain of circumstantial evidence" in this case was legally sufficient to support the verdict against Petitioner.

As Petitioner's legal insufficiency claim is without merit, Petitioner cannot show that he suffered any prejudice as a result of his abandonment of the claim on his direct appeal and the resulting procedural default. Accordingly, this Court recommends that this claim be dismissed with prejudice as unexhausted and procedurally barred.

**b.     Alleged *Brady* or *Youngblood* Violation**

Petitioner's second claim relates to the supposed loss of the memo books of Officer Vernelly (who testified to having frisked Petitioner at the time of his initial arrest and to having found a ring in his pocket (Dkt. 14-3, at 320)), and Sergeant Vargas (who testified to the police's later recovery of two rings from Petitioner, one of which was the property of one of the victims of the robbery (Dkt. 14-4, at 18-19)). On direct appeal, Petitioner claimed that the memo books constituted *Rosario* material, which should have been preserved and produced, and that the failure to do so had warranted the sanction of an adverse inference, which the trial court had erred in refusing to grant. (*See* Pet. App. Br., at 63-66; Addendum to Leave Ltr., at 9-10.) [26] Now, in his habeas Petition, Petitioner claims that the prosecution's failure to produce these two memo books constituted a constitutional due process violation, under *Brady*. (*See* Supp. Pet., at 14.) In addition, by citing to *Arizona v. Youngblood*, 488 U.S. 51 (1988), Petitioner seems to

---

[26] It does not appear that Petitioner is seeking to raise his claim here under *Rosario*, nor could he do so. As a state-law claim, a claim based on *Rosario* would not be cognizable on federal habeas review. *See Landy v. Costello*, 141 F.3d 1151 (Table), No. 97-2433, 1998 WL 105768, at *1 (2d Cir. Mar. 9, 1998) ("To the extent that [Petitioner's] claim is based on a *Rosario* violation, it must fail, because a habeas petition can only be granted to remedy some violation of *federal* law; the obligation to turn over *Rosario* material arises under state law." (emphasis in original)); *see also Henderson v. Martuscello*, No. 10cv5135 (DLC), 2013 WL 6463348, at *11 (S.D.N.Y. Dec. 10, 2013) ("Petitioner's claim of a *Rosario* violation is a state law claim that is not cognizable on habeas review." (citations omitted)).

be raising a claim that his federal due process rights were violated by the failure of the police to preserve the memo books in question.  *See* Supp. Pet., at 14; *see generally Youngblood* (addressing the standard for when a failure to preserve potentially exculpatory evidence will give rise to a due process violation).[27]  Based on the record, though, Petitioner simply cannot demonstrate a constitutional violation based on the non-production or lack of preservation of the two officers' memo books.  Accordingly, Petitioner cannot demonstrate that he was prejudiced by his appellate counsel's failure to raise this claim on appeal.

Under *Brady*, as noted above, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."  373 U.S. at 87; *see* n.16, *supra*.  Information falling within the scope of the *Brady* rule includes "not only evidence that is exculpatory, *i.e.*, going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.*, having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *U.S. v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (citing *Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).  The prosecution's obligation to make such disclosures, however, is limited to evidence that is "material."  *Avellino*, 136 F.3d at 256 (citing *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

"'[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *U.S. v. Gilley*, 279 F.

---

[27] In connection with this second habeas claim, Petitioner also cites to *Davis v. Alaska,* 415 U.S. 308 (1974) and *Stone v. Powell*, 428 U.S. 465 (1976) (*see* Supp. Pet., at 14), but neither of those decisions seems applicable to this claim.  Although *Davis* discusses the importance of a criminal defendant's right to meaningful cross-examination of prosecution witnesses, it does not relate to any alleged failure to preserve or produce evidence, *see generally Davis*, and *Powell*, as discussed in Section II(B)(3)(c), is a Fourth Amendment case, *see generally Powell*.

App'x 19, 25-26 (2d Cir. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)).

Therefore, evidence is material if it "'could reasonably be taken to put the whole case in such a

different light as to undermine confidence in the verdict.'"  *Poventud v. City of New York*, 750

F.3d 121, 156 (2d Cir. 2014) (quoting *Kyles,* 514 U.S. at 435).  Impeachment evidence is

material "where the witness in question supplied the only evidence linking the defendant to the

crime" or "where the witness supplied the only evidence of an essential element of the offense."

*Avellino*, 136 F.3d at 256-57 (citations omitted).  Impeachment evidence is *not* material where it

would "not likely . . . have changed the verdict," even though the evidence might have been

"useful to the defense."  *Giglio*, 405 U.S. at 154 (citation omitted); *see also Strickler v. Greene*,

527 U.S. 263, 281-82 (1999) (noting that "prejudice" is a necessary component of a *Brady*

claim).

        The Supreme Court has also held that, while, under *Brady*, the good or bad faith of the

State is irrelevant when the State fails to disclose to a criminal defendant "material exculpatory

evidence," *Youngblood*, 488 U.S. at 57, a failure by the police to preserve only "potentially

useful evidence" will not constitute a denial of due process, unless the criminal defendant can

show that the police acted in bad faith, *id*. at 58; *accord Colon v. Kuhlmann*, 865 F.2d 29, 30

(2d Cir. 1988).  Moreover, under the law of this circuit, even the State's deliberate destruction of

evidence will not rise to the level of a constitutional violation unless the loss of the evidence can

be shown to have prejudiced the defense.  *See United States v. Bakhtiar*, 994 F.2d 970, 975-76

(2d Cir. 1993); *see also U.S. v. Wilson*, 159 F.3d 1349 (Table), No. 97-1298 (2d Cir. Mar. 13,

1998) (summary order) (government's bad faith destruction of evidence was not a constitutional

violation where defendants "failed to show that the destroyed items had exculpatory value, that

they were unable to obtain comparable evidence by other means, or that [the destruction of evidence] had any effect on the outcome of [the defendants'] case").

In this case, it is far from clear that the evidence in question would have been useful for the impeachment of the police officers' credibility, as there is no evidence in the record that suggests that the memo books in question would have revealed any information inconsistent with Vernelly's and Vargas's trial testimony.  Indeed, nothing in the record suggests that either Vernelly or Vargas even wrote any statements in their memo books regarding the events in question.[28]  At most, then, Petitioner can only speculate that the unproduced evidence would have been useful to him for impeachment purposes, and such speculation is fatal to his claim. *See, e.g.*, *United States v. Ramirez,* No. 09cr446 (CM), 2011 WL 6945199, at *2 (S.D.N.Y. Dec. 23, 2011) (denying a motion under *Youngblood* where it was not clear that the allegedly lost recordings "were ever made," and finding that, even assuming they were made, the defendant could "only speculate" that the recordings possessed exculpatory value).  Further, there is no evidence in the record to suggest that the police acted in bad faith, in failing to preserve the memo books as potentially useful evidence.  *See id.* (noting that the defendant had "proffer[ed] no evidence that any recordings – if they existed – were lost or destroyed intentionally or in bad faith"); *see also United States v. Rastelli*, 870 F.2d 822, 833 (2d Cir. 1989) (holding that a missing evidence claim "must fail" where the record was "barren of proof that the government

---

[28] At the suppression hearing, Officer Vernelly testified that he recalled that he made no memo book entries related to the October 2, 2006 incident in his memo book (Dkt. 14-2, at 12), though he later testified at the trial that he did not recall whether or not he had made any entries in his memo book related to that date (Dkt. 14-3, at 326).  At trial, Petitioner's counsel thoroughly cross-examined Officer Vernelly regarding this discrepancy, as well as on the question of whether his memory about the incident could be considered reliable without the benefit of any memo book entries to aid his recollection.  (*See* Dkt. 14-3, at 329-36.)  Sergeant Vargas testified at both the suppression hearing and at trial that he did not make any memo book entries regarding the incident.  (Dkt. 14-4, at 23-24; Dkt. 14-2, at 107-08.)  Petitioner's counsel also cross-examined Sergeant Vargas with respect to the reliability of his memory regarding the incident.  (Dkt. 14-4, at 24-25, 27.)

lost the evidence in bad faith"); *Brock v. Artuz*, No. 99cv1903 (AJP), 2000 WL 1611010, at *8 (S.D.N.Y. Oct. 27, 2000) (destruction of evidence claim dismissed where petitioner failed to establish both that missing evidence was "exculpatory" and that there was any "bad faith on the part of the police or prosecution" in the destruction).

This Court does note that, unlike the evidence at issue in *Youngblood*, the evidentiary value of the memo books would have been evident to the police or the prosecution before their loss.  *See Bakhtiar*, 994 F.3d at 975-76 ("[T]he evidence we have here did not need to be tested to determine its value; it is possible in this case that government agents recognized some exculpatory value in the tapes and destroyed them or that government agents made use of the lost evidence before it was lost.").  Nonetheless, Petitioner's suggestion that, contrary to their sworn testimony, (1) Sergeant Vargas and Officer Vernelly did in fact make memo book entries related to the incident, (2) that those memo book entries indicate that no ring was found on Petitioner's person, and (3) that both memo books were intentionally disposed of or destroyed (rather than lost), is far too speculative to make out a successful claim that the evidence was material, as required under *Brady*, or destroyed in bad faith, as required under *Youngblood*.

For these reasons, I recommend that any federal claim that Petitioner is attempting to raise, arising out of the prosecution's failure to produce or preserve Officer Vernelly's and Sergeant Vargas's memo books, also be dismissed as procedurally barred.

### c.     Alleged Denial of Due Process at Suppression Hearing and at Trial

For his third habeas claim, Petitioner asserts that he was denied due process of law because (a) the loss of Vernelly's and Vargas's memo books denied him evidence that would have been necessary for a full and fair suppression hearing, and (b) another police witness,

Officer Catlin, was apparently on vacation in Florida at the time of Petitioner's trial, and was therefore unavailable to testify.  (*See* Supp. Pet, at 14.)

**i.**    <u>**Alleged Denial of a Full and Fair Suppression Hearing**</u>

As to the first part of Petitioner's claim, while Petitioner claimed on direct appeal that his Fourth Amendment rights had been violated (*see* Pet. App. Br., at 35-62; *see also* Addendum to Leave Ltr., at 4-8), he never argued, as he does now, that the suppression hearing *itself* was conducted unfairly, in violation of his constitutional due process rights.  Petitioner's due process claim, however, would plainly fail under this Circuit's standards for construing the bounds of such a claim under *Powell v. Stone*, 428 U.S. 465 (1976).

In *Powell*, the Supreme Court articulated the principle that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial."  *Powell*, 428 U.S. at 494 (footnotes omitted).  Since then, the Second Circuit has developed a "litmus test" to evaluate whether a state prisoner has been denied the opportunity to litigate a Fourth Amendment claim "fully and fairly," such that his due process rights could be said to have been violated.  Such a denial of due process occurs (and, thus, federal habeas review is warranted) only where (a) "the state has provided no corrective procedures to redress the alleged fourth amendment violations," or (b) "the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992) (citing *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977)).

34

The Second Circuit has not precisely defined the circumstances under which an "unconscionable breakdown" will be found, but it has noted that a "disruption or obstruction of a state proceeding" would be typical of such a breakdown. *Id.* (citations omitted).  Furthermore, district courts in this Circuit have held that an "unconscionable breakdown in the state's process must be one that calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society." *Cappiello v. Hoke*, 698 F. Supp. 1042, 1050 (E.D.N.Y. 1988) (noting as examples the bribing of a state court judge, the government's knowing use of perjured testimony, and the use of torture to extract a guilty plea), *aff'd*, 852 F.2d 59 (2d Cir. 1988) (per curiam); *accord Cotto v. Fischer*, No. 09cv9813 (SAS) (MHD), 2012 WL 550575, at *21 (S.D.N.Y. Aug. 23, 2012) (finding no unconscionable breakdown in process where the trial court had afforded the petitioner a full *Mapp* hearing and had delivered a detailed explanation of its ruling that probable cause existed), *report and recommendation adopted*, 2012 WL 5499890 (Nov. 12, 2012); *Munford v. Graham*, No. 09cv7899 (DLC) (AJP), 2010 WL 644435, at *15 (S.D.N.Y. Feb. 24, 2010), *report and recommendation adopted*, 2010 WL 2720395 (June 29, 2010), *aff'd*, 467 F. App'x 18 (2d Cir. 2012).

While Petitioner argues that he was not provided with a "full and fair suppression hearing" (Supp. Pet., at 14), he does not contend – nor could he – that he was denied access to "corrective procedures" to redress his claim.  The state court considered Petitioner's pre-trial motion to suppress evidence and held a suppression hearing – in which testimony was taken on five days, from a total of 11 witnesses, and at which Petitioner was represented by counsel, who cross-examined witnesses and made arguments on Petitioner's behalf.  (*See* Dkts. 14-1; 14-2; 14-3, at 1-86.)  After considering the evidence adduced at the hearing, as well as the parties'

written arguments, the trial court issued a lengthy ruling on the record denying Petitioner's request for the suppression of evidence.  (Dkt. 14-3, at 88-131.)  In addition, Petitioner raised his Fourth Amendment claim on direct appeal, where it was considered and addressed by the Appellate Division, and in which the Appellate Division ruled that "[t]he rapidly unfolding sequence of events justified every aspect of the police conduct."  *Butler*, 917 N.Y.S.2d at 149.

In these circumstances, Petitioner was plainly afforded access to state-court procedures to remedy any Fourth Amendment violation.  *See, e.g.*, *Capellan*, 975 F.2d at 70 n.1 (noting that "federal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate" (citations omitted)); *Walker v. Walker*, 259 F. Supp. 2d 221, 225 (E.D.N.Y. 2003) (finding court could not review Fourth Amendment claims where petitioner "ha[d] fully availed himself of the procedures embodied in [C.P.L.] 710.10 *et seq.* [regarding the suppression of evidence], and in the process of doing so ha[d] been afforded an opportunity for the full and fair consideration of all Fourth Amendment violations claimed in his federal petition."); *Nunez v. Conway*, 923 F. Supp. 2d 557, 568 (S.D.N.Y. 2013) (dismissing Fourth Amendment claim where "the trial court conducted a suppression hearing on [the petitioner's] probable cause and suggestive identification claims . . . [and] the petitioner then litigated those claims before the Appellate Division and sought review from the Court of Appeals").  Thus, having taken advantage of existing state procedures for the review of his Fourth Amendment claim, Petitioner can only argue that that procedure suffered an "unconscionable breakdown."

Yet, there is absolutely nothing in the record that could suggest that Petitioner's suppression hearing and subsequent appeal were disrupted, obstructed, or otherwise suffered any kind of breakdown whatsoever, much less a breakdown that could be found "unconscionable."

At most, Petitioner complains that the absence of the two memo books rendered his suppression hearing unfair, but, as discussed above, there was not even evidence in the record suggesting that the police witnesses in question had made any relevant notations in those memo books.  Further, these witnesses themselves took the stand at the suppression hearing and were cross-examined at length by Petitioner's counsel, regarding their recollections.  Moreover, the loss of the memo books was an issue that was presented to both the trial court and the Appellate Division, both of which considered Petitioner's arguments, and laid out reasoned bases for rejecting them.  Under these circumstances, Petitioner cannot prevail on his claim that that he was denied a "full and fair" opportunity to litigate any alleged Fourth Amendment violation.

### ii.   Alleged Denial of a Fair Trial

Petitioner also cannot demonstrate that he was denied due process as a result of Officer Catlin's absence from trial.  In order to establish a due process violation, Petitioner would have to establish that Officer Catlin's absence "actually render[ed] [his] state trial fundamentally unfair and hence, violative of due process."  *Herring v. Meachum*, 11 F.3d 374, 377 (2d Cir. 1993) (citations omitted).  Petitioner, however, cannot make such a showing, as Officer Catlin was a minor witness, and a prosecution witness, at that.  To the extent that his testimony might have borne on the credibility of Sergeant Vargas and Officer Vernelly (as a result of some purported inconsistences between Officer Catlin's testimony regarding the events taking place at the scene at 10th Street and Fourth Avenue and the testimony of Vargas and Vernelly (*see* Pet. App. Br., at 68-69)), the trial court granted Petitioner's request for a missing witness charge as a result of Catlin's absence.  Particularly in view of this curative action by the trial court, Petitioner cannot show his trial was fundamentally unfair as a result of Officer Catlin's absence.  *See, e.g.*, *Castro v. Fischer*, No. 04cv346 (DLC), 2004 WL 2525876, at *5

(S.D.N.Y. Nov. 8, 2004) (finding no due process violation even where trial court failed to give a missing witness charge).[29]

       Furthermore, although Petitioner does not specifically raise this argument here, this Court notes that there would also be no due process consequence with respect to a corollary argument he made on direct appeal – that, based on Officer Catlin's "sudden unavailability and the inconsistent statements of witnesses" regarding the recovery of the stolen jewelry, the trial court erred in giving a "recent and exclusive possession" charge.  (Pet. App. Br., at 66-69.)  In light of the testimony of Sergeant Vargas and Officer Vernelly that a stolen ring was recovered from Petitioner's person shortly after the robbery, it would appear that the trial court was well within its discretion in giving this charge, as, indeed, the Appellate Division found.  *See Butler*, 917 N.Y.S.2d at 149.  Further, in evaluating whether a jury charge constitutes a *due process* violation, "the question is not whether the trial court gave a faulty instruction, but rather 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violate[d] due process.'"  *Davis v. Strack,* 270 F.3d 111, 123 (2d Cir. 2001) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973) (additional citations omitted)).  As Petitioner cannot even show the "recent and exclusive possession" charge to have been erroneous, he certainly cannot show merit in any constitutional claim that the charge violated his due process right to a fair trial.

---

    [29] Having not attempted to introduce any of Officer Catlin's suppression hearing testimony at trial, Petitioner argued on appeal that the prosecutor "knew Officer Catlin could provide exculpatory evidence on behalf of [Petitioner], but he allowed him to go on vacation in Florida during the trial and intentionally misl[e]d counsel to believe that he would be called as a witness until the end of trial."  (Pet. App. Br., at 67 n.18.)  The record does demonstrate that the prosecutor did not confirm, until the last day of trial, that Officer Catlin would not be testifying.  (*See* Dkt. 14-4, at 230-31, 236-37.)  To the extent that the Petition can be read to allege prosecutorial misconduct, however, any misconduct in this regard did not render Petitioner's trial fundamentally unfair, for the same reasons that Officer Catlin's absence did not violate Petitioner's due process rights.  *See Floyd v. Meachum*, 907 F.3d 347, 353 (2d Cir. 1990) (to constitute a due process violation, prosecutorial misconduct must be "so prejudicial that [it] rendered the trial in question fundamentally unfair").

As Petitioner cannot demonstrate that there is any merit to his due process claim – with respect to the loss of the memo books, the unavailability of Officer Catlin, or the jury charge that was given at trial – he again cannot overcome the procedural bar to the Court's review of the claim, and I recommend that this claim also be dismissed.

### d.   Due Process Violation from Denial of Speedy-Trial Motion

The right of an accused to a speedy trial is guaranteed by the Sixth Amendment and is imposed upon the states by the Due Process Clause of the 14th Amendment.  *See Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967).  Specifically, the Sixth Amendment provides, in relevant part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. Amend. VI.  The speedy-trial provision "has no application until the putative defendant in some way becomes an 'accused,'" *i.e.*, when a putative defendant has been indicted or actually detained.  *United States v. Marion*, 404 U.S. 307, 313, 320 (1971).  Unlike other constitutional rights, however, "deprivation of the right [to a speedy trial] may work to the accused's advantage," given, for example, that "[d]elay is not an uncommon defense tactic," and "witnesses [including adverse witnesses] may become unavailable or their memories may fade."  *Barker v. Wingo*, 407 U.S. 514, 521 (1972).  In determining whether a "particular defendant has been deprived of his right" to a speedy trial, a court must therefore balance four factors:  (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant.  *Id.* at 530.

With respect to the first factor, "[t]he length of the delay is to some extent a triggering mechanism.  Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."  *Id.*  Furthermore, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious complex

conspiracy charge." *Id.* at 531.  In this case, Petitioner was arrested on October 2, 2006, and his trial commenced on February 29, 2009.  This delay of nearly two and a half years for the ordinary street crime of which Petitioner was convicted weighs in Petitioner's favor on his speedy-trial claim.  *See United States v. Vassell*, 970 F.2d 1162, 1164 (2d Cir. 1992) (suggesting that any delay over eight months is presumptively prejudicial, but rejecting speedy-trial claim where government sought delay to encourage codefendant to testify against defendant, case was complex, and delay did not alter defense).  This alone is not dispositive, however, as courts have found that significantly longer delays did not violate a criminal defendant's Sixth Amendement right to a speedy trial.  *See, e.g.*, *Barker*, 407 U.S. at 533-36 (delay of "well over five years" between arrest and trial did not constitute violation of constitutional right to speedy trial, in light of the four-factor analysis); *United States v. Lane*, 561 F.2d 1075, 1078-79 (2d Cir. 1977) (although delay of 58 months was "quite lengthy," defendant's Sixth Amendment right to a speedy trial was not violated).

As to the second *Barker* factor, the reasons for the delay of Petitioner's trial,

> [a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.  A more neutral reason such as negligence or overcrowded courts should we weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.

*Barker*, 407 U.S. at 531.  In this case, it appears that the overall time from Petitioner's arrest to his trial was composed of several seemingly-reasonable intervals for motion practice; preparation for hearings and for trial; and the challenges of accommodating the schedules of multiple attorneys, witnesses, defendants, and the trial court.[30]  For example, the case was pending for

---

[30] The record before this Court does not include the transcripts of all of the conferences held in the course of Petitioner's trial court proceedings.  This Court has therefore reviewed the detailed submissions made to the Appellate Division with respect to Petitioner's state

42 days for submission and disposition of the defendants' pre-trial motions; for 40 days to obtain

DNA evidence results and prepare for pre-trial hearings; for 47 days after Bailey obtained new

counsel; and for 29 days when, after the prosecution requested a one-week adjournment, the

parties could not propose a sooner date on which all witnesses, counsel, and the court would be

available.  Although not all of the time is accounted for in the appellate briefs, and although

some of the delays are attributable to the prosecution or the trial court, there is no indication in

the record that the prosecution acted with negligence, much less that the prosecution deliberately

delayed trial in order to hamper the defense.  Accordingly, this factor weighs only modestly in

Petitioner's favor.  *See United States v. Alvarez*, 541 F. App'x 80, 84 (2d. Cir. 2013) (where

delay was predominantly attributable to discovery and motions and was attributable to both

sides, reason for delay did not weigh in defendant's favor); *Holden v. Miller*, No. 00cv0926

(RMB) (ALP), 2000 WL 1121551, at *11 (S.D.N.Y. Aug. 8, 2000) (report and recommendation)

("[S]ince nothing in the record indicates a deliberate attempt by the State to delay the trial in

order to hamper [the petitioner's] defense, this factor does not weigh in [the petitioner's]

favor."), *adopted by* Order (Oct. 10, 2000) (slip op.).

   As to the third factor – the defendant's assertion of his Sixth Amendment right to a

speedy trial – "[t]he defendant's assertion of his speedy trial right . . . is entitled to strong

evidentiary weight in determining whether the defendant is being deprived of the right[,] [and]

failure to assert the right will make it difficult for a defendant to prove that he was denied a

speedy trial."  *Barker*, 407 U.S. at 531.  There is no indication in the record that, at any point

---

speedy-trial motion pursuant to N.Y. Crim. Proc. L. § 30.30.  (*See* Pet. App. Br., at 28-35; Resp.
App. Br., at 56-87.)  From these submissions, it appears that the parties are in sufficient
agreement as to the reasons for the various adjournments and delays that further transcripts are
not necessary to enable the Court to address Petitioner's constitutional speedy-trial claim.

prior to trial, Petitioner asserted his Sixth Amendment right to a speedy trial.[31]  Accordingly, this factor weighs strongly against Petitioner's claim of a Sixth Amendment violation.  *See id.*; *see also United States v. Howard*, 443 F. App'x 596, 599 (2d Cir. 2011).

Finally, as to the fourth factor – prejudice – Petitioner has not alleged any specific prejudice occasioned by the delay, and none is obvious from the record.[32]  While this is not necessarily fatal to a speedy-trial claim, *see Doggett v. United States*, 505 U.S. 647, 655 (1992), the length of time here is not sufficient for this Court to presume prejudice of a constitutional magnitude, *id.* at 658 (finding that delay of eight and a half years, coupled with delay occasioned by "the Government's egregious persistence in failing to prosecute" the defendant, was "clearly sufficient" to establish a presumption of prejudice).  Accordingly, this factor does not weigh in Petitioner's favor.

On balance, although there was a significant delay between Petitioner's arrest and his trial, Petitioner has not demonstrated that he suffered any prejudice as a result of this delay, and therefore he cannot demonstrate, in light of all of the relevant factors, that the delay gave rise to a constitutional violation.  Thus, once again, he cannot show that the procedural default of this claim resulted in the "prejudice" necessary to overcome the procedural bar.  Accordingly, I recommend that this claim, too, be dismissed.

---

[31] It is unclear from the record at what point Petitioner moved to dismiss the indictment pursuant to New York Criminal Procedure Law Section 30.30(1).  Regardless, a motion pursuant to Section 30.30, unlike a motion pursuant to Section 30.20, does not raise constitutional speedy-trial concerns.  (*See* n.12, *supra*.)

[32] This Court notes, in this vein, that, even at the time of the suppression hearing in 2007, Sergeant Vargas's and Officer Vernelly's memo books were already missing, and that Officer Catlin's unavailability was not attributable to the passage of time.

**CONCLUSION**

For all of the foregoing reasons, each of Petitioner's habeas claims is unexhausted and procedurally barred, and Petitioner cannot overcome the procedural bar with respect to any of his claims.  I therefore recommend that the Petition be dismissed in its entirety.  Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), as Petitioner has not "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail).  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Shira A. Scheindlin, United States Courthouse, 500 Pearl Street, Room 1620, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Scheindlin.  FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBEJCTIONS AND WILL PRECULDE APPELLATE REVIEW.  (*See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).)

If Petitioner does not have access to cases cited herein that are reported only on Westlaw, he may request copies from Respondent's counsel.  (*See* Local Civ. R. 7.2 ("Upon request,

counsel shall provide the *pro se* litigant with copies of [cases and other authorities cited therein that are unpublished or reported exclusively on computerized databases] as cited in a decision of the Court and were not previously cited by any party.").)

Dated: New York, New York
      February 18, 2015

                  Respectfully submitted,

                  DEBRA FREEMAN
                  United States Magistrate Judge

Copies to:

Hon. Shira A. Scheindlin, U.S.D.J.

Mr. Denard Butler
09-A-3804
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY 10562

Counsel for Respondent (via ECF)